UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA *ex rel.* CKD
PROJECT, LLC,

                    Plaintiff,

                                                            **REPORT &**
                                                            **RECOMMENDATION**
                                                            14-CV-6646-RRM-SJB

          -against-

FRESENIUS MEDICAL CARE HOLDINGS, INC.,
NEW YORK DIALYSIS SERVICES, INC., FMS NEW
YORK SERVICES LLC, and BIO-MEDICAL
APPLICATIONS MANAGEMENT COMPANY, INC.,

                    Defendants.
---------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

          Relator CKD Project, LLC ("Relator") filed this action against Defendants

Fresenius Medical Care Holdings, Inc., New York Dialysis Services, Inc., FMS New York

Services LLC, and Bio-Medical Applications Management Company, Inc. (collectively,

"Fresenius" or "Defendants"), asserting four causes of action under the False Claims Act

("FCA"), 31 U.S.C. §§ 3729, *et seq.* (Am. Compl. dated Nov. 8, 2019 ("Am. Compl."),

Dkt. No. 58-1 ¶¶ 1, 104–24). On March 6, 2020, Fresenius filed a motion to dismiss.

(Defs.' Notice of Mot. to Dismiss Am. Compl. dated Jan. 3, 2020 ("Mot."), Dkt. No. 69).

For the reasons stated below, the Court respectfully recommends that the motion be

granted.

                    <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

          Defendants' motion is brought pursuant to Rules 12(b)(1) and 12(b)(6) because

the alleged conduct took place before and after 2010, when the FCA was amended. The

amendment had the effect of changing whether the public disclosure bar—the subject of Defendants' motion—is a matter of subject matter jurisdiction. Thus, the facts, which the Court accepts as true for the purposes of Defendants' motion, are set forth in the Amended Complaint as follows. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."); *Laurant v. City of New York*, No. 17-CV-5740, 2019 WL 1364230, at *1 & n.1 (E.D.N.Y. Mar. 26, 2019) (regarding 12(b)(6)).[1]

Relator is a New York limited liability company that was formed for the sole purpose of bringing this action. (Am. Compl. ¶ 6). Fresenius provides outpatient dialysis services to patients, including those with end-stage renal disease ("ESRD"), through more than 2,000 centers it operates in North America. (*See id.* ¶ 7, 41). ESRD is a chronic disease "characterized by permanent kidney failure that can be treated either through a kidney transplant or dialysis, a medical filtering process that replaces kidney function by removing fluids and waste from the body." (*Id.* ¶ 41). ESRD patients may undergo dialysis as frequently as three times per week. (*Id.*). A majority of dialysis patients receive some form of Medicare coverage. (*Id.* ¶ 42).

Relator alleges that Fresenius employed schemes in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), whereby doctors were paid to refer their dialysis patients to Fresenius facilities. (*Id.* ¶¶ 2–5, 44). This scheme was effectuated

---

[1] "But '[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *Tandon*, 752 F.3d at 243 (alteration in original) (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

through Fresenius's expansion: Fresenius acquired controlling interests in dialysis clinics throughout the country, and while original physician-owners held a minority interest in their respective clinics, Fresenius "pa[id] them remuneration which far exceeded the value of any tangible assets" of the clinics.  (*Id.*).  Relator alleges that Fresenius paid the physicians above-market value for their clinics, and that this excess constituted payment to induce the doctors to refer patients back to these clinics.  (*Id.* ¶¶ 3, 44–46).  The Anti-Kickback Statute prohibits such payments in connection with Medicare and Medicaid reimbursement.  (*Id.* ¶¶ 5, 23); 42 U.S.C. § 1320a-7b(b).

    As one example, Relator cites the "Hauppauge Transaction."  (Am. Compl. ¶ 47). In December 2010, Fresenius acquired Apollo-Hauppauge—known as the Suffolk Kidney Center—a Long Island, New York dialysis center.  (*Id.* ¶ 48).  Apollo-Hauppauge itself was a joint venture of two entities: Suffolk Nephrology PLLC and 30 Central LLC. (*Id.* ¶ 50; *see also id.* at 29–30).  The Hauppauge Transaction required the creation of a new Fresenius entity, FMS Hauppauge LLC ("FMS Hauppauge"), whose sole member was New York Dialysis Services, Inc.  (*Id.* ¶ 51).  New York Dialysis Services, Inc. assigned its ownership in FMS Hauppauge to Apollo-Hauppauge (and therefore, to Suffolk Nephrology PLLC and 30 Central LLC), in exchange for certain "contributed" assets.  (*Id.* ¶¶ 51–52).  These assets included certain fixed assets, proprietary rights, assumed contracts, and claims and rights to the contributed assets, among others.  (*Id.* ¶ 54; Contribution and Redemption Agreement dated Dec. 1, 2010 ("C&R Agreement"), attached as Ex. A. to Am. Compl., Dkt. No. 58-2 § 2.2).  Among the assets not transferred by the C&R Agreement were Medicare and Medicaid claims from before December 1, 2010, "all patient lists, patient appointment books and other medical records used or generated in connection with the Business," and documents and data

related to these excluded assets.  (C&R Agreement § 2.3(g), (h), (q), *see also id.* § 1.1, at 4 (defining "Effective Time")).[2]

Relator alleges that Fresenius's separate payment for the medical records, patient lists, and patient books; the agreement that Apollo-Hauppauge would strive to preserve its customer relationships and goodwill of the business; and Fresenius's above-market payment to Suffolk Nephrology PLLC and 30 Central LLC for their non-patient assets are all evidence of Fresenius's renumeration for ongoing and future patient referrals. (Am Compl. ¶¶ 52–73).

Fresenius used this same "business model" in various transactions, including the acquisition of dialysis centers in Watertown, New York and Niagara Falls, New York. (*Id.* ¶¶ 76–80).  And Fresenius used the same strategy nationwide.  (*Id.* ¶¶ 82–103). Relator claims that when Fresenius submitted Medicare and Medicaid claims that were for services provided through these illicitly induced referrals, it violated the Anti-Kickback Statute and the False Claims Act.  (*Id.* ¶¶ 25–26, 74–75).

Relator commenced this action on November 12, 2014.  (Compl. dated Nov. 12, 2014, Dkt. No. 1).  Relator filed an Amended Complaint on November 8, 2019, asserting four causes of action: two claims for violations of the FCA, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), respectively; a claim for conspiracy to violate the FCA under 31 U.S.C. § 3729(a)(1)(C); and a claim for a violation of 31 U.S.C. § 3729(a)(1)(G) ("the

---

[2] Medical records, patient lists, and patient books were transferred to FMS Hauppauge under the Article 28 Agreement.  (Am. Compl. ¶ 55; *see also* Article 28 Asset Contribution and Purchase Agreement dated Dec. 1, 2010 ("Article 28 Agreement"), attached as Ex. B. to Am. Compl., Dkt. No. 58-3 § 2.4).  Fresenius paid additional renumeration connected with that Agreement.  (Am. Compl. ¶¶ 61–62).

reverse false claims provision").  (Am. Compl. ¶¶ 104–24).[3]  Fresenius filed its fully

briefed motion to dismiss the Amended Complaint on March 6, 2020.  (Mot.).[4]

<u>DISCUSSION</u>

"A motion to dismiss an action under Federal Rule 12(b)(1) . . . raises the

fundamental question whether the federal district court has subject matter jurisdiction

over the action before it."  5B Charles Alan Wright & Arthur R. Miller et al., *Federal*

*Practice and Procedure* § 1350 (3d ed. 2020).  A motion under Rule 12(b)(1) is

"analytically different" from a Rule 12(b)(6) motion; "the former determines whether

the plaintiff has a right to be in the particular court and the latter is an adjudication as to

whether a cognizable legal claim has been stated."  *Id.*

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take

all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable

inferences in favor of the party asserting jurisdiction."  *Tandon*, 752 F.3d at 243.

> "[W]here jurisdictional facts are placed in dispute, the court has the power
> and obligation to decide issues of fact by reference to evidence outside the
> pleadings, such as affidavits."  In that case, the party asserting subject
> matter jurisdiction "has the burden of proving by a preponderance of the
> evidence that it exists."

*Id.* (first quoting *APWU*, 343 F.3d at 627; next quoting *Makarova v. United States*, 201

F.3d 110, 113 (2d Cir. 2000)).  "A 'case is properly dismissed for lack of subject matter

jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or

---

[3] Fresenius Medical Care AG & Co. KGaA, a German company that wholly owns Fresenius Medical Care AG & Co., was a named defendant in the original Complaint but is not a defendant in the Amended Complaint.  (Am. Compl. ¶ 7).

[4] The United States declined to intervene.  (The United States' Notice of Election to Decline Intervention dated Aug. 27, 2018, Dkt. No. 14).

constitutional power to adjudicate it.'" *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (quoting *Makarova*, 201 F.3d at 113), *aff'd*, 568 U.S. 85 (2013).

For a 12(b)(6) motion, the Court must accept the factual allegations set forth in a complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Once the Court construes the facts in the light most favorable to the relator, to avoid dismissal, there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A complaint must contain more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557). In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.; *accord* Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (footnote omitted) (citation omitted). The determination of whether a relator has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

When deciding a 12(b)(6) claim, a district court does not consider factual allegations found in the parties' briefing materials or attached affidavits. *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) ("Thus, a district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants, or relies on factual

allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (alteration in original) (citation omitted) (quoting *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991))). "In resolving a motion to dismiss, review is generally limited to 'the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Santana v. Weill Cornell Med. Primary Care*, No. 17-CV-7420, 2018 WL 4636988, at *3 (S.D.N.Y. Sept. 27, 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)); *see also In re Merrill Lynch & Co. Rsch. Reps Sec. Litig.*, 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) ("In deciding a Rule 12(b)(6) motion, the Court may consider the following materials: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." (footnotes omitted)), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

"The False Claims Act (FCA) imposes liability on any person who 'knowingly presents . . . a false or fraudulent claim for payment or approval,' 'to an officer or employee of the United States.'" *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015) (alteration in original) (first quoting 31 U.S.C. § 3729(a)(1)(A); then quoting 31 U.S.C. § 3729(b)(2)(A)(i)). "The FCA defines a 'claim'

7

as 'any request or demand . . . for money or property' that is presented, directly or indirectly, to the United States." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (alteration in original) (quoting 31 U.S.C. § 3729(b)(2)(A)).  The FCA "may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government."  *Id.* (quoting *Kellogg Brown & Root Servs.*, 135 S. Ct. at 1973).

I.    The Public Disclosure Bar

"Claims under the FCA are subject to a public disclosure bar that prohibits a relator from bringing a claim for conduct that has already been made public." *United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F. Supp. 3d 186, 195 (E.D.N.Y. 2018).  The public disclosure bar seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010).

> The public disclosure bar provides that courts "shall dismiss an action or claim under [§ 3730] . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in a federal action (amongst other avenues) "unless . . . the person bringing the action is an original source of the information."

*Chorches*, 865 F.3d at 79 (alterations in original) (quoting 31 U.S.C. § 3730(e)(4)(A)).[5] As such, a two-step analysis determines whether the public disclosure bar applies: first, "whether the substance of a relator's claim had been disclosed prior to the filing of his suit," *Patriarca*, 295 F. Supp. 3d at 196, and second, "whether, if such disclosures had been made, the relator can be considered an 'original source,'" *id.* (quoting *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 346 (S.D.N.Y. 2014)).

A.    Prior Public Disclosure of Relator's Claim

Public disclosures may be found "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or "from the news media." 31 U.S.C. § 3730(e)(4)(A); *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011) ("This broad ordinary meaning of 'report' is consistent with the generally broad scope of the FCA's public disclosure bar. . . . The other sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep.' The

---

[5] The FCA's disclosure bar was amended in 2010. Prior to March 2010, the public disclosure bar was jurisdictional—that is, it served as a basis for dismissal under Rule 12(b)(1)—the post–March 2010 version is non-jurisdictional, and so Rule 12(b)(6) applies. *See id.* at 80. This change is not retroactive, and thus claims arising prior to March 2010 are assessed under Rule 12(b)(1), while claims postdating the amendment are assessed under Rule 12(b)(6). *Patriarca*, 295 F. Supp. 3d at 195 ("Since the amendment does not mention retroactivity and effects a substantive change in the law, the conduct alleged in [a relator's] complaint must be assessed under the law that existed when the conduct took place." (alteration in original) (quoting *United States ex rel. Amico v. Deutsche Bank AG*, No. 15-CV-9551, 2017 WL 2266988, at *4 n.4 (S.D.N.Y. May 8, 2017))); *see also United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *11 (E.D.N.Y. Mar. 31, 2017) (collecting cases).

statute also mentions 'administrative hearings' twice, reflecting intent to avoid underinclusiveness even at the risk of redundancy.  The phrase 'allegations or transactions' in § 3730(e)(4)(A) additionally suggests a wide-reaching public disclosure bar." (second alteration in original) (quoting *Graham Cnty. Soil & Water Conservation Dist.*, 559 U.S. at 290, 293)); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 17 (2d Cir. 2011).

The public disclosures must be "sufficient to set the government squarely upon the trail of the alleged fraud," *Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 298 (S.D.N.Y. 2013) (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1041 (10th Cir. 2009)), so that "it is possible to say that the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute," *id.* (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).

"Prior to the 2010 amendment, the [public disclosure] bar applied where a *qui tam* action was '*based upon* the public disclosure of allegations or transactions.'" *Kester*, 43 F. Supp. 3d at 346 (quoting 31 U.S.C. § 3730(e)(4)(A) (2006)).  "[A]ctions were 'based upon' public disclosures if the allegations in the relator's complaint were 'substantially similar' to those disclosures; the relator's knowledge of the fraud need not have actually derived from the public disclosures at issue."  *Id.* (quoting *Ping Chen*, 966 F. Supp. 2d at 298 n.11).  After the 2010 amendment, "the public disclosure bar applies 'if *substantially the same* allegations or transactions as alleged in the action or claim were publicly disclosed.'"  *United States ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 454 (S.D.N.Y. 2017) (emphasis added) (quoting 31 U.S.C. § 3730(e)(4)(A)

10

(2010)).  As such, "under both the pre- and post-2010 versions of the statute, courts assess whether the allegations in a *qui tam* complaint are substantially the same as or substantially similar to the allegations of fraud contained in the public disclosures in question." *Patriarca*, 295 F. Supp. 3d at 196 (quoting *Kester*, 43 F. Supp. 3d at 346).[6]

Whether a relator's allegations are substantially similar to the public disclosure turns on if "the public disclosures 'exposed all the essential elements of the alleged fraud.'"  *United States ex rel. Vierczhalek v. MedImmune, Inc.*, 345 F. Supp. 3d 456, 462 (S.D.N.Y. 2018) (quoting *New York ex rel. Khurana v. Spherion Corp.*, No. 15-CV-6605, 2016 WL 6652735, at *12 (S.D.N.Y. Nov. 10, 2016)), *aff'd*, 803 F. App'x 522 (2d Cir. 2020).

Fresenius relies on its SEC Form 20-F filings  to argue that Relator's claims must be dismissed under the public disclosure bar.  (*See generally* Mem. at 11–17).  Because these filings disclose the same "transactions as alleged" by Relator, 31 U.S.C. § 3730(e)(4)(A), and all the essential elements of the alleged fraud, Relator's claims must be dismissed.

Fresenius Medical Care AG & Co. KGaA's  2013 Form 20-F states that its dialysis centers are "joint ventures in which [Fresenius] hold[s] a controlling interest and one or more hospitals, physicians or physician practice groups hold a minority interest." (Fresenius Medical Care AG & Co. KGaA, Annual Report (Form 20-F), at 6 (Feb. 25, 2014) ("2013 Form 20-F"), attached as Ex. 1 to Decl. of Jonathan Z. DeSantis, Dkt. No.

---

[6] As Fresenius notes, "[t]he Amended Complaint does not specify a date range at issue but appears to attempt to plead claims based on both pre-and post-2010 conduct. Fresenius acquired an interest in the Hauppauge joint venture in 2010 but has had joint venture operations since the mid-2000s."  (Mem. in Supp. of Defs.' Mot. to Dismiss Relator's Am. Compl. dated Jan. 3, 2020 ("Mem."), Dkt. No. 69-20 at 10 n.3).

70-1).  Those physicians or practice groups "may refer patients to those" same centers "or other centers [Fresenius] own[s] and operate[s] or to other physicians who refer patients to those centers or other centers [Fresenius] own[s] and operate[s]."  (*Id.*).  And Fresenius's financial success depends significantly on such referrals.  (*Id.* at 24 ("Our ability to provide high-quality dialysis care and to fulfill the requirements of patients and doctors depends significantly on our ability to enlist nephrologists for our dialysis clinics and receive referrals from nephrologists, hospitals and general practitioners."); *see also id.* at 10 ("If physicians and other referral sources cease referring patients to our dialysis clinics or cease purchasing or prescribing our dialysis products, our revenues would decrease. . . . If a significant number of physicians, hospitals or other healthcare institutions cease referring their patients to our clinics, this would reduce our dialysis care revenue and could materially adversely affect our overall operations.")).  That is because, "[a]t most of [Fresenius's] clinics, a relatively small number of physicians often account for the referral of all or a significant portion of the patient base."  (*Id.*).

An entity that knowingly pays or offers any form of renumeration to induce a referral for service payable under a federal healthcare program violates the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(b)(2)(A) ("Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony[.]").  The joint venture feature of Fresenius's clinics—*i.e.*, the fact that Fresenius owned them alongside physicians—and

the fact physicians would refer patients to those same or other Fresenius-owned clients are the foundation of Relator's Anti-Kickback Statute allegations:

> Fresenius knowingly executed an illegal joint venture strategy in violation of both the [Anti-Kickback Statute] and the FCA. Specifically, Fresenius devised a fraudulent business model by which cash and other valuable remuneration were funneled through Fresenius-controlled entities to the physician-owners of dialysis clinics targeted by Fresenius for acquisition in order to induce those physicians to refer their dialysis patients to Fresenius. These transfers were accomplished through a series of interrelated agreements that left Fresenius with a controlling interest in each dialysis clinic's operations. Fresenius induced the physicians/sellers of these clinics to enter these joint ventures by paying them remuneration which far exceeded the value of any tangible assets owned by the clinics and which instead reflected the expected financial return—to Fresenius—of future referrals from the physicians/sellers.

(Am. Compl. ¶ 44).

And it went further, by stating that the transactions may not qualify for "safe harbor" protection under the Anti-Kickback Statute, and that Fresenius's transactions may ultimately be found to have been in violation of the statute—the precise conduct Relator claims it has uncovered:

> A number of the dialysis centers and vascular access centers we operate are owned, or managed, by joint ventures in which we hold a controlling interest and one or more hospitals, physicians or physician practice groups hold a minority interest. . . . While we have structured our joint ventures to comply with many of the criteria for safe harbor protection under the U.S. Federal Anti-Kickback Statute, our investments in these joint venture arrangements do not satisfy all elements of such safe harbor. . . . [I]f one or more of our joint ventures were found to be in violation of the Anti-Kickback Statute . . . , we could be required to . . . repay to Medicare amounts received by the joint ventures pursuant to any prohibited referrals, and we could be subject to criminal and monetary penalties and exclusion from Medicare, Medicaid and other U.S. federal and state healthcare programs. Imposition of any of these penalties could have a material adverse effect on our business, financial condition and results of operations.

(2013 Form 20-F at 6).[7]  In this way, the 2013 Form 20-F offers sufficient details "to set the government squarely upon the trail of the alleged fraud," *Ping Chen*, 966 F. Supp. 2d at 298 (quoting *In re Nat. Gas Royalties*, 562 F.3d at 1041)), namely that Fresenius's acquisitions of outpatient dialysis facilities may violate the Anti-Kickback Statute.

Relator's arguments to the contrary are without merit.  Relator argues that the public disclosures

> do not mention: (1) Fresenius's payment of vastly excessive remuneration to providers for the purchase of a controlling interests in their dialysis practices, (2) that Fresenius utilized a complicated array of agreements and entities to effectuate and obfuscate its conduct, (3) that Fresenius allocated the overwhelming majority of its investment to patient "goodwill," *i.e.* patient referrals, (4) that the providers made little to no financial contribution to the joint ventures despite maintaining a minority interest, (5) that Fresenius  paid providers for warranties regarding the number of their patient relationships, their efforts to preserve those relationships, and the intention of their patients to continue seeking treatment from Fresenius, (6) that Fresenius paid providers for the goodwill associated with patient appointment books and lists, or [(7)] that Fresenius engaged in this conduct for the purpose of securing patient referrals.

(Relator's Opp'n to Defs.' Mot. to Dismiss Relator's Am. Compl. dated Feb. 14, 2020 ("Opp'n"), Dkt. No. 70 at 15).  But such detail and factual distinctions are irrelevant unless the alleged public disclosure fails to include an essential element of the fraud and a relator's information fills that gap.

---

[7] The Anti-Kickback Statute does not apply to, *inter alia*, "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" or "any remuneration between an organization and an individual or entity providing items or services, or a combination thereof, pursuant to a written agreement between the organization and the individual or entity if the organization is an eligible organization under section 1395mm of this title[.]"  42 U.S.C. § 1320a-7b(b)(3)(B), (F); *see also* 42 C.F.R. § 1001.952.  Fresenius does not specify the potentially applicable safe harbor provisions that could apply to its conduct.

For example, in *United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, the relator alleged that Novartis was violating the Anti-Kickback Statute by influencing pharmacies to dispense its drugs to patients and doctors. 43 F. Supp. 3d at 340. According to the relator, Novartis "decided to 'leverage' these pharmacies' influence—it offered them kickbacks in the form of rebates, discounts, and patient referrals to induce them to 'recommend' its drugs to doctors or patients." *Id.* (quotation omitted). One of the defendants in the case was a pharmacy chain—Caremark—which had previously been sued by a number of state attorneys general for, by example, "attempt[ing] to persuade physicians or patients to switch to certain drugs so that Caremark could 'maximize' its receipt of rebates on those drug sales from drug manufacturers." *Id.* at 348 (quotation omitted). Those lawsuits were public, as was Caremark's subsequent settlement. *Id.* at 348–49. Notwithstanding this public information, the relator alleged that the disclosure bar did not apply because the publicly disclosed reports left out certain "aspects of the kickback scheme: (1) Novartis's involvement in the scheme, (2) the specific drugs that Caremark dispensed . . . ; (3) the use of exclusive distribution networks and patient referrals, and (4) the pharmacies' efforts to increase patient refills through 'high touch' programs." *Id.* at 349 (quotation omitted). The District Court concluded that these were merely additional details about the scheme, but the essential elements—the renumeration for drug referrals—were already in the public record. *Id.* at 350 ("The publicly disclosed allegations would have been more than sufficient to alert the United States to bring an action against Caremark for violating the AKS (or state law analogues)[.]").

Similarly, here, although Relator lists facts and details not in the Form 20-F, it has not identified an "essential element" of alleged kickback violations not in the SEC

Form 20-F disclosure.  Instead, Relator has provided additional details on a set of relationships and transactions that are disclosed in the SEC filings.  There are always additional nuances and granular details of a scheme to defraud, but that does not make the claims unique and outside of the disclosure bar.  For instance, that referrals and joint ownership was accomplished through a "complicated array" of entities and documents, (Opp'n at 5), rather than in a straightforward manner, is just additional detail: the disclosures already tell the public that Fresenius used joint ownership structures and relies on referrals for the success of its dialysis clinics.  That Fresenius executed these transactions "for the purpose of securing patient referrals," (*id.* at 15), or that it allocated its investment to goodwill in the form of referrals, is nothing more than gloss on the central part of Fresenius's revenue plan—one that relies on referrals and is detailed in its SEC disclosures, (*see, e.g.*, 2013 Form 20-F at 10, 57).  These facts may flesh out the specific details of the alleged fraud but do not expose any new elements. *United States ex rel. Amico v. Citigroup, Inc.*, No. 14-CV-4370, 2015 WL 13814187, at *9 (S.D.N.Y. Aug. 7, 2015) ("[T]he fact that the Relator[s] provided more information about the scheme does not mean that the . . . public disclosures . . . did not expose all the essential elements of the alleged fraud." (first and second alterations in original) (quoting *Kester*, 43 F. Supp. 3d at 350)).  "[P]roviding 'greater detail about the underlying conduct' is not enough to avoid the public disclosure bar when the complaint 'targets' the same fraudulent scheme that was revealed in a prior public disclosure." *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 143–44 (1st Cir. 2020) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 210 (1st Cir. 2016)) (rejecting arguments that claims were not substantially similar to previously alleged fraud where relator provided details about a different type of

renumeration, a longer duration of the alleged kickback scheme, and "more aggressive" methods used to incentivize patients to change prescription to certain drug in violation of the Anti-Kickback Statute).

Relator claims that Fresenius paid "excessive" sums for its share in its joint venture, while the doctors and others paid little—in other words, that the additional monies were hidden payments for the referrals it would receive from those ventures—and that it paid for guarantees of ongoing referrals. The existence of such a *quid pro quo* arrangement may transform Fresenius's transactions from legal ones into violations of the Anti-Kickback Statute—which requires renumeration paid for the referral for there to be a violation—but it does not provide an unknown essential element. All the tying of Fresenius's payments to the referrals does is transform a benign transaction into an unlawful one. But that does not mean that the disclosure was not sufficient to invoke the disclosure bar: "[t]he bar is triggered if 'material elements' of the fraud have been publicly disclosed, and does not require that the alleged fraud, itself, have been disclosed." *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 262 (S.D.N.Y. 2020) (quoting *Patriarca*, 295 F. Supp. 3d at 197); *see, e.g.*, *Monaghan v. Henry Phipps Plaza W., Inc.*, 531 F. App'x 127, 130 (2d Cir. 2013). In other words, Fresenius need not have admitted to fraud for the public disclosure bar to apply; its disclosure of its referrals as a revenue source and its joint venture arrangement, including its admission of compensation to paid to physician-owners for ownership interests, would cause any informed reader—like a regulator—to ask whether the company was paying kickbacks or otherwise inducing referrals (or had taken appropriate steps to avoid paying or being seen to make such payments).

And if it were not obvious that such an arrangement could involve illegal tying, Fresenius made it clear in its Form 20-F by admitting that the joint ventures do not necessarily fall within a safe harbor provision of the Anti-Kickback Statute.  (2013 Form 20-F at 6).  In other words, by falling outside of the safe harbor, Fresenius is disclosing that some of the terms of the acquisitions may provide renumeration to individuals in a position to make referrals.  The government could deduce from this disclosure that the terms of the joint ventures may violate the Anti-Kickback Statute.[8]  The 2013 Form 20-F thus discloses the material elements of the kickback fraud that is alleged in the Complaint, and the public disclosure bar applies.[9]

---

[8] Relator contends that applying the disclosure bar to block its claims here "would have the perverse outcome of allowing entities to avoid FCA liability by including innocuous risk language" (Opp'n at 17).  The disclosure here blocks Relator's claims not because it is "innocuous risk language"; to the contrary, it is not boilerplate, but a specific disclosure that details Fresenius's operations and identifies by name the potential law it may be violating.  And, as for the implication that dismissing Relator's claim leads to allegedly illegal conduct being ignored, that makes little sense.  The public disclosure bar does not immunize misconduct, it merely prevents a relator from bringing a FCA claim; the Government can still investigate—either civilly or criminally—violations of the Anti-Kickback Statute by Fresenius.

[9] Fresenius also cites a Medicare Payment Advisory Commission's March 2012 report to Congress, (Medicare Payment Advisory Comm'n, Report to the Congress: Medicare Payment Policy (Mar. 15, 2020), attached as Ex. 17 to Decl. of Ronald L. Castle in Supp. of Defs.' Mot. to Dismiss Relator's Am. Compl. ("Castle Decl."), Dkt. No. 69-1), and a *Nephrology News & Issues* article from July 2005, (James B. Riley, Jr. & Robert Pristave, *Dialysis Facility Joint Ventures—Current Structures and Issues*, Nephology News & Issues, July 2005, attached as Ex. 16 to Castle Decl.), to support its public disclosure arguments.  (Mem. at 3).  The Court does not reach the question of whether these documents standing alone would be sufficient to bar Relator's claims.

B. <u>Original Source</u>

Even the disclosures trigger the public disclosure bar, a relator's claim can nonetheless avoid dismissal if the relator qualifies as an original source. *Patriarca*, 295 F. Supp. 3d at 196, 202–03.

Under the pre-2010 FCA, an original source has "direct and independent knowledge" of the alleged fraud. *Kirk*, 437 F. App'x at 17–18 ("At times relevant to this lawsuit, the FCA defined 'original source' to mean 'an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.'" (quoting 31 U.S.C. § 3730(e)(4)(B) (2006)); *Monaghan*, 531 F. App'x at 130 (requiring relator to have "direct and independent knowledge of 'the information upon which [his] allegations are based'" (alteration in original) (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 470–71 (2007))); *United States ex rel. Keshner v. Immediate Home Care, Inc.*, No. 06-CV-1067, 2016 WL 3545699, at *2 (E.D.N.Y. June 24, 2016) (same). Under the post-2010 FCA, a relator is an original source if it "'voluntarily disclosed to the [g]overnment the information on which allegations or transactions in a claim are based' or 'has knowledge that is *independent of and materially adds* to the publicly disclosed allegations[,] . . . and who has voluntarily provided the information to the [g]overnment before filing an action.'" *Vierczhalek*, 345 F. Supp. 3d at 463 (quoting 31 U.S.C. § 3730(e)(4)(B) (2010)) (alterations in original) (emphasis added). "The Second Circuit has not yet decided which definition should apply when a relator's allegations include pre and post 2010 conduct." *Patriarca*, 295 F. Supp. 3d at 202 (collecting cases); *see*

*also Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 n.1 (2d Cir. 2017).  However, Relator is not an original source under either standard.

Relator admits that it is an entity formed for the sole purpose of this litigation and that it acquired its information from a third party.  (Am. Compl. ¶¶ 6, 12, 49).  Under the pre-2010 FCA, as an entity that has never been involved with Fresenius prior to the filing of this action, and whose information is wholly derived from an anonymous third party, (*id.* ¶¶ 12, 49), and public disclosures, (*id.* ¶¶ 101–102), Relator, by definition, cannot have either direct or independent knowledge of the alleged fraud, *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 72 (D. Conn. 2006) (noting relator has independent knowledge when relator has "substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation" and has direct knowledge when it has witnessed the fraud first-hand (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991))); *United States ex rel. Aryai v. Skanska*, No. 09-CV-5456, 2019 WL 1258938, at *5 (S.D.N.Y. Mar. 19, 2019) (concluding relator was not an original source when source of information was a third party).

Relator is also not an original source under the post-2010 FCA.  To qualify as an original source there, Relator must have "knowledge that is independent of and materially adds to the publicly disclosed allegations."  *Vierczhalek*, 345 F. Supp. 3d at

465 (quoting 31 U.S.C. § 3730(e)(4)(B)).[10]  "[F]or new allegations to 'materially add' to public disclosures, they must 'substantially' or 'considerably' add to information that is already public."  *Vierczhalek*, 803 F. App'x at 526 (quoting *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694–95 (8th Cir. 2014)).  "[A] relator who merely adds detail or color to previously disclosed elements of an alleged scheme is not materially adding to the public disclosures."  *Winkelman*, 827 F.3d at 213; *United States ex rel. Coyne v. Amgen, Inc.*, 229 F. Supp. 3d 159, 172 (E.D.N.Y. 2017) (same), *report and recommendation adopted*, 243 F. Supp. 3d 295, *aff'd*, 717 F. App'x 26 (2d Cir.).  "A relator who simply 'conducted some collateral research and investigations' in response to public allegations, and paired the results of that research with her background information, does not qualify as an original source."  *Vierczhalek*, 803 F. App'x at 525–26 (quoting *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.3d 1148, 1159 (2d Cir. 1993)).  "Allegations . . . must add value to what the government already knew."  *United States ex rel. Hastings v. Wells Fargo Bank, NA*, 656 F. App'x 328, 331–32 (9th Cir. 2016).

Relator's additional information neither is "independent of" nor "materially adds to" public disclosures.  Relator provides no detail about the source of its information other than to allege that its source is a third party who is an "inside participant one of the fraudulent joint venture transactions," (Am. Compl. ¶ 12), and that its information was not "previously publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4)(A),"

---

[10] Relator may also be an original source under the post-2010 standard if Relator, "prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based[.]"  31 U.S.C. § 3730(e)(4)(B).  Relator does not argue it falls within this provision. (Opp'n at 17–21).

(*id.*).  This conclusory statement, couched in legalese, tells the Court nothing and is insufficient to demonstrate the extent of Relator's contributions to the public record.

It appears its contributions were minimal, if at all.  Relator appends several documents to the Amended Complaint, including the C&R Agreement and the Article 28 Agreement, and incorporates exhibits from prior motions, which include various joint venture agreements obtained through discovery, (*see* Am. Compl. ¶ 76 n.7; Relator's Reply re Mot. to Compel dated Sept. 13, 2019, Dkt. No. 54), and requests for production and interrogatories and Fresenius's objections to such, (*see* Am. Compl. ¶ 97 & n.10; Relator's Mot. to Compel dated Aug. 12, 2019, Dkt. No. 49).  Relator argues that the documents demonstrate that it has materially contributed to the public disclosures.  There are two fundamental problems with this position.  Without telling the Court the source of these documents, there is no basis to infer that the Relator itself is providing this information or that is simply recycling information from the litigation.  A relator cannot "materially add" "independent" information to public disclosures with items obtained through discovery requests.  Otherwise, any relator could file a placeholder complaint—based solely on public disclosures—then serve discovery requests, obtain documents, and argue that bringing the suit and obtaining non-public documents through the litigation process is its contribution.

Beyond that, these documents add merely "color," *Winkelman*, 827 F.3d at 213, and do not "'substantially' or 'considerably' add to information that is already public," *Vierczhalek*, 803 F. App'x at 526 (quoting *Paulos*, 762 F.3d at 694–95).  Information about how the joint ventures were contractually and financially arranged including, for example, which assets were contributed by the C&R Agreement and Article 28 Agreement, respectively, in the Hauppauge Transaction, (Am. Compl. ¶¶ 51–55); when

and how medical records, patient lists, and patient books were transferred to FMS Hauppauge, (*id.* ¶¶ 55, 61; Article 28 Agreement § 2.4); and that Fresenius paid additional renumeration to accompany the Article 28 Agreement, (Am. Compl. ¶¶ 61–62), are more specific facts about what already has been publicly disclosed by Fresenius. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 815–16 (11th Cir. 2015) (finding "background information and details relating to the value of the services offered, making it somewhat more plain that the clinics' programs could violate the" Anti-Kickback Statute were not sufficient to make relator an original source).

Similarly, Relator alleges that the C&R Agreement contains a provision under which providers would make "reasonable efforts" to preserve patient relationships and that the Fresenius paid renumeration for such goodwill, which demonstrates Fresenius's intention to pay for the inducement of referrals. (C&R Agreement § 4.19(a); *accord* Am. Compl. ¶ 54; Opp'n at 6–7). As discussed above, however, it can be inferred from the 2013 Form 20-F that patient referrals were key to the success of Fresenius's ventures, and, therefore, Fresenius would account for such patient relationships when assessing the value of a potential venture. (*See, e.g.*, 2013 Form 20-F at 10, 24). And if one draws such an inference, it would be similarly logical to ask whether Fresenius paid the providers for their patient relationships, particularly in light of its disclosure that the Anti-Kickback Statute's safe harbors may not apply.

Similarly, details regarding the corporate structure of the joint ventures, (*e.g.*, Am. Compl. at 29–30), the allocation of the ventures' purchase price, (*e.g.*, *id.* ¶ 77), the price of each transaction in relation to the "fair market value," (Opp'n at 7, 19–20), and that the C&R Agreement contained a noncompete clause, (Am. Compl. ¶ 57; C&R Agreement § 6.10), paint a clearer picture of the alleged fraud but do not considerably

add to the information already available to the public.  *E.g.*, *United States ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 735 (M.D. Tenn. 2013) (finding details regarding value of renumeration did not materially add to the public disclosures).  Therefore, Relator's information does not materially add to the public disclosures, and Relator is not an original source.  *E.g.*, *United States ex rel. Maur v. Hage-Korban*, No. 17-CV-1079, 2020 WL 912753, at *5 (W.D. Tenn. Feb. 25, 2020) ("*Qui tam* complaints that merely add details to *what is already known in outline* do not materially add to the publicly disclosed fraud." (quoting *United States ex rel. Advocs. for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016))), *aff'd*, 981 F.3d 516, 526–28 (6th Cir. 2020) (affirming and finding that providing more instances of alleged fraud would not necessarily change the government's decision-making and thus does not materially add to the public disclosures).

For the foregoing reasons, the First and Second claims should be dismissed.

II.    Reverse False Claims

The Fourth Claim asserts a cause of action under 31 U.S.C. § 3729(a)(1)(G), also known as the "Reverse False Claims" provision of the FCA.[11]  (Am. Compl. ¶¶ 120–24).  To state a such a claim, Relator must allege (1) "the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the

---

[11] "[T]his subsection . . . took effect on May 20, 2009, and applies only to conduct occurring on or after that date."  *United States ex rel. Piacentile v. Amgen, Inc.*, 336 F. Supp. 3d 119, 135 n.5 (E.D.N.Y. 2018).  Relator only alleges a claim under § 3729(a)(1)(G), not its predecessor, 31 U.S.C. § 3729(a)(7) (1994), which previously governed reverse false claims.  (Am. Compl. ¶¶ 120–24).

government—a duty to pay money or property." *Piacentile*, 336 F. Supp. 3d at 135 (quoting *Kester*, 43 F. Supp. 3d at 368).

"Where a complaint makes no mention of any financial obligation that the [defendants] owed to the government, and does not specifically reference any false records or statements used to decrease such an obligation, the court should dismiss the subsection (a)(1)(G) claim." *Id.* (alteration in original) (quoting *Kester*, 43 F. Supp. 3d at 368); *see also Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 388 (S.D.N.Y. 2015) ("Congress intended for FCA liability [for reverse false claims] to attach in circumstances where, as here, there is an established duty to pay money to the government, even if the precise amount due has yet to be determined."). Relator argues that Fresenius had an obligation to return Medicare reimbursements it was not entitled to—because it acted in violation of the Anti-Kickback Statute—within 60 days of the identification of the overpayment. (Opp'n at 21–23). Fresenius's obligation thus turns on its alleged violation of the Anti-Kickback Statute and, therefore, the FCA. But because Relator has failed to overcome the public disclosure bar of the FCA—that is, it has not stated a claim for violation of the FCA—it cannot have alleged an obligation to pay money to the government. *E.g.*, *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 249–50 (2d Cir. 2019) ("[Relator]'s reverse false claim theory thus fails for the same reason that his other FCA claims fail. . . . [T]he SAC does not plausibly allege that Defendants-Appellees caused the submission of false claims to the federal government. Accordingly, the SAC does not plausibly allege that Defendants-Appellees had any obligation to repay to the federal government any funds it received, directly or indirectly, as a result of the Medicaid claims it submitted[.]"), *cert. denied*, 140 S. Ct. 1296 (2020); *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp.

3d 276, 292 (E.D.N.Y. 2016) (dismissing reverse false claims when relator failed to allege regular false claim).

The motion to dismiss as to the Fourth Claim should be granted.

III.    False Claims Act Conspiracy

For a FCA conspiracy claim, Relator must allege "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and (2) one or more conspirators performed any act to effect the object of the conspiracy." *United States v. Spectrum Painting Corp.*, No. 19-CV-2096, 2020 WL 5026815, at *15 (S.D.N.Y. Aug. 25, 2020) (quoting *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 705 (S.D.N.Y. 2018)).  The conspiracy claim is sparsely pled but appears to be coextensive with the allegations that comprise the preceding FCA claims under sections 3729(a)(1)(A) and 3729(a)(1)(B). (Am. Compl. ¶ 117).  Relator has failed to state a claim for violation of the FCA under either of these sections, and so Relator's conspiracy claim must also be dismissed.  *E.g.*, *Patriarca*, 295 F. Supp. 3d at 203 (finding that, insofar as conspiracy claim relied on the fraud to which the public disclosure bar applied, it did not survive the motion to dismiss); *A1 Procurement, LLC v. Hendry Corp.*, No. 11-CV-23582, 2013 WL 12061864, at *7 (S.D. Fla. June 24, 2013) (finding that relator's FCA conspiracy claim rose and fell with underlying FCA claims when the "allegations of an FCA conspiracy are wholly based upon the allegations of FCA violations found within" the previous claims). Therefore, the Third Claim should be dismissed.[12]

---

[12] Fresenius finally argues that Relator has failed to plead with particularity any claims of fraud apart from the Hauppauge Transaction.  (Mem. at 23–25).  The Court does not reach this issue.

IV.   Relator's Leave to Amend

Relator seeks leave to file a Second Amended Complaint if the Court grants the motion to dismiss.  (Opp'n at 29).  The Court respectfully recommends that Relator not be granted leave to file a Second Amended Complaint.  "Leave to amend should be 'freely give[n] . . . when justice so requires,' but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party[.]'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (alterations in original) (first quoting Fed. R. Civ. P. 15(a)(2); then quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)).  As discussed above, whether a Second Amended Complaint would be futile turns upon whether the public disclosure bar applies to the alleged fraud.  Given that the First Amended Complaint was filed with the benefit of significant amounts of discovery, the broad scope of Defendants' SEC filing—which discloses a potential fraud from referrals that violate the Anti-Kickback Statute—and the nature of Relator—created solely for the purpose of this litigation—the Court concludes that any further amended complaint would not overcome the public disclosure bar; nor could Relator establish it was an original source.  As such, a Second Amended Complaint would be futile, and leave should be denied.  *E.g.*, *Vierczhalek*, 803 F. App'x at 526; *Ping Chen*, 966 F. Supp. 2d at 304–05; *United States ex rel. Tahlor v. AHS Hosp. Corp.*, No. 08-CV-2042, 2013 WL 5913627, at *17 (D.N.J. Oct. 31, 2013).

CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Dismiss be granted and that Relator not be granted leave to file a Second Amended Complaint.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[] [judge's] report operates as a waiver of any further judicial review of the magistrate[] [judge's] decision." (quotations omitted)).

SO ORDERED.

*/s/ Sanket J. Bulsara* January 27, 2021
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

28